RECEIVED PC SCAN MAN
6/6/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

25-cv-06306
Judge Sara L. Ellis
Magistrate Judge Jeannice W. Appenteng
Direct PC 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIE SPATES (R50820) | |
| | |
| v. | |
| | |
| CHARLES TRUITT, Warden, | |
| AWO BENSON, Assistant Warden, | |
| LATOYA HUGHES, Dir. IDOC | |
| ILLINOIS DEPT. OF CORRECTIONS, (IDOC) | **COMPLAINT** |
| WEXFORD HEALTH SOURCES INC, | |
| DR. HENSLEY, Medical Director, | Civil Action #_____ |
| DR. PEREZ, Medical Director, | |
| DR. VYDAS, Physician, | |
| MS. B. CHUA, Healthcare Administrator, | |
| DR. AGUINAGA, Physician, | |
| NP ORR, Nurse Practitioner, | |
| NP WILLIAMS, Nurse Practitioner, | |
| NP BRUCKNER, Nurse Practitioner, | |
| L. ALLEN, Grievance Officer, | |
| ANNA McBEE, Grievance Officer, | |
| ELENA RIVERA, Grievance Officer, | |
| JEREMY BONNET, IDOC Admin. Review Bd. | |

## I. JURISDICTION AND VENUE

1. This is a civil action authorized by 42 U.S.C. §1983 to redress the depri-
vation, under color of state law, of rights secured by the Constitution of
the United States. The Court has jurisdiction under 28 U.S.C. §1331 & 1343
(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §2201 &
2202. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C.
§2283 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2. The Northern District Court of Illinois is an appropriate venue under 28
U.S.C. §1391(b)(2) Because it is where the events giving rise to this
claim occurred.

1

## II. PLAINTIFF

3.  Plaintiff, Willie Spates, is and was at all times mentioned herein a prisoner of the State of Illinois int the custody of the Illinois Dept. of Corrections. (IDOC) He is currently confined at Dixon Correctional Center, in Dixon, Illinois.

## III. DEFENDANTS

4.  Defendant, CHARLES TRUITT, is the Warden of Stateville Correctional Center. He is legally responsible for the operation of Stateville Correctional Center and for the welfare of all the inmates in that prison.

5.  Defendant, Awo Benson, is the Assistant Warden of Stateville Correctional Center, and he is legally responsible for the operations division of Stateville Correctional Center, and the oversight of the medical operations in that prison.

6.  Defendant, Latoya Hughes, id the Director of the Illinois Department of Corrections. She is legally responsible for the overall operation of the Department and each instituiton under it's jurisdiction, including Stateville CC.

7.  Defendant, Illinois Department of Corrections, is the Governmental Department prescribed by the State of Illinois for the administration and care of all of the individuals placed in their custody.

8.  Wexford Health Sources Inc., is the medical care provider which the State of Illinois has contracted with to provide medical professionals and medical care and services for all of the individuals who are placed into the custody of the IDOC. They provide and promulgate rules and procedures for all of the medical personnel employed by the IDOC or Wexford Health Sources Inc. who then are legally responsible for the health and welfare of all of the individuals in the custody of the IDOC.

9.  Defendant, Dr. Hensley, is the Medical Director for Stateville CC for the period of time relevant to the events of this complaint. He was legally responsible for the health and welfare of the inmates in that prison.

10. Defendant, Dr. Perez, is the current medical director of Stateville CC, and successor to Dr. Hensley. He is legally responsible for the health and welfare of the inmates at Stateville CC, including a period of time relevant to the events of this complaint.

11. Defendant, Dr. Vydas, is a primary care physician who was legally responsible for the health and welfare of individuals at Stateville CC.

12. Defendant, B. Chua, is the Healthcare Administrator at Stateville CC. She is legally responsible for ensuring the care provided to the inmates at that prison.

13. Defendant, Dr. Aguinaga, is a primary care physician who was legally responsible for the health and welfare of individuals at stateville CC.

14. Defendant, NP Orr, is a Nurse Practitioner at Stateville CC. She is responsible legally for providing medical care at that prison.

15. Defendant, NP Williams, is a Nurse Practitioner at Stateville CC. She is responsible legally for providing medical care at that prison.

16. Defendant, NP Williams, is a Nurse Practitioner at Stateville CC. She is responsible legaly for providing medical care at that prison.

17. Defendant, NP Bruckner, is Nurse Practitioner at Stateville CC. She is responsible for legally providing medical care at that prison.

18. Defendant, L. Allen, is a Corrections Officer at Stateville CC assigned as a Grievance Review Officer. She is responsible for reviewing inmate grievance reports at that prison.

19. Defendant, Anna McBee is a Corrections Officer at Stateville CC assigned as a Grievance Review Officer. She is responsible for reviewing inmate grievance reports at that prison.

20. Defendant, Elena Rivera, is a Corrections Officer at Stateville CC assigned as Grievance Review Officer. She is responsible for reviewing inmate grievance at that prison.

21. Defendant, Jeremy Bonnet, is a member of the IDOC Administrative Review Board. He is responsible for reviewing inmate grievances from institutions including Stateville CC and providing oversight of issues presented which have been denied by the administration of those institutions.

3

22. Each Defendant is sued individually and in his[or her] official capacity. At all times mentioned in this complaint, each defendant acted under the color of law.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

23. I have exhausted my Aministrative Remedies

    a) There is a Grievance Procedure at Stateville CC

    b) I have filed grievances concerning the facts in this complaint.

    c) I have taken the following steps:

        1) I filed 3 grievances per IDOC guidelines, complaining of ongoing denial of medical care; diagnosis and treatment of Cancer.

        2) All 3 grievances proceeded through the first and second levels of review and were denied; denied by the Chief administrative Officer.

        3) All 3 grievances were submitted to the IDOC Administrative Review Board.

        A) This is the current result:

            a) Grievance #K03-0224-0164   (No response after 1 year)

            b) Grievance #K03-0424-0316   (Denied by Admin. Rev. Bd)

            c) Grievance #K03-0324-0269   (Denied by Admin. Rev. Bd)

    d) I have been transferred from Stateville CC to Dixon CC.

    e) I have submitted a letter to the Admin. Rev. Bd. for the status of Grievance #K03-0224-0164.

## V. FACTS

24. I arrived at Stateville CC in 2017. Upon my arrival I notifed medical staff of the medical issues I was experiencing during urination. These included; frequent urination, straining, incomplete emptying of bladder. Symptoms I have learned which are consistent with prostate complications including Cancer.

25. Although I had been seen by medical staff, none of the staff conferred the possibility of Cancer, and no testing for Cancer was provided until I sought out the assistance of a physician who was seeing me for another issue at University of Illinois Hospital, Chicago.

4

26. While at the University of Illinois Hospital, Chicago, I was seen on November 8, 2023, by a Dr. Moreira who was extremely concerned that I had not received any type of prostate disgnostic testing. He ordered my blood to be drawn immediately for a PSA Screening. I would later learn the result of the test to show a 108.5 result.

27. In December of 2023 I was agian seen by Stateville CC medical staff for follow up of my November appointment. Not for my prostate concern or to even inform me of the result of the test, but to speak about my other issue for which I had seen Dr. Moreira in the first place. No mention of my prostate issue was acknowledged or was I given information concerning future treatment.

28. In January of 2024 I was returned to UICH where Dr. Moreira,after performa seperate procedure, performed a prostate biopsy. Again upon my return to Stateville CC no mention of my ongoing prostate issue was addressed by medical staff with me.

29. In February of 2024 a second PSA Screening was conducted and I would later learn that my PSA had risen to 129.4. I was physical and mentally ill as a result of the continued stress of not knowing if I was going to receive treatment or die from the lack of it. I was transported to UICH this time to meet with Oncologist Dr. Nazine. At this meeting I was informed that I had an aggressive form of Cancer of the Prostate and that it was at a Stage 3level.⸮He was surprised when I told him that no Statville CC medical personell had relayed this information or ordered any type of treatment to relieve my pain and stress.

30. Approximately a week after being seen by Dr. Nazine I was again brought to UICH and this time spoke with Oncology Specialist Dr. Hashi. He went over the treatment plan to address my prostate Cancer and asked me how my treatment was going so far. I explained to him that Stateville CC medical staff were denying that they had any information concerning my prostate screening or diagnosis, or any treatment. Dr. Hashi stated that orders had been sent

to Stateville informing them of the treatment plan and medicine I should
have already been receiving.

31. On March 13, 2024, I was transported to UICH to consult with the oncology
staff again. At that meeting I informed Dr. Nazine that I was still not re-
ceiving any medicine or treatment. Additionally, I was being told by med-
ical staff at Stateville that they had not recieved any orders, that there
was nothing in my medical file, and that they weren't aware of any cancer
diagnosis. Dr. Nazine stated "My cancer treatment plan is being delayed by
Stateville, that I was behind on my treatment chemo schedule, and that she
was going to be sending orders for me to start Hormone therapy along with
other meds and to begin radiation therapy." (paraphrased)

32. On March 19, 2024, I returned to UICH where I was supposed to have 2 ap-
pointments, however, I was only seen for a CT Scan. The other appointment,
which I was refused by Stateville staff to know what the appointment was,
was canceled; no reason being given for the cancelation. During this time
I was met by an unknown John Doe Intern to whom I lamented that I was not
receiving any treatment still. This intern then looked into the UICH com-
puter and found all the orders and schedule of treatment I was supposed
to be receiving. He stated that he could not explain why I wasn't being
treated as all of these orders had been transmitted, and received by State-
ville.

33. On April 8th, 2024, I was again transported to UICH this time for an MRI.
However, upon arrival I was informed that the MRI was going to be reched-
uled. Instead I was then seen by UICH oncology team led by Dr. Sun. After
I informed Dr. Sun about what I was experiencing Dr. Nazine was located
and brought into the consult. The whole team was visually disturbed over
the events I related and Dr. Sun contacted Stateville medical staff to be
apprised of there lack of following the treatment plan that had been or-
dered. After concluding the conversation Dr. Sun informed me that they were
going to be filing a formal medical complaint. I was then placed on the
phone with a Ms. Cheryl who took a verbal statement from me to begin the
complaint.

34. While at Stateville CC I was notified that I was going out to begin radiation therapy, however, I was not sent, nor was any reason given why. I had previously been informed that today, 4/15/2024, was the date agreed upon by all medical staffs, UICH and Stateville, that I would begin radiation and chemo-therapy.

35. On April 18, 2024, I finally began my radiaiton and chemo-therapies. I would continue with regular radiation treatments at UICH, 18 total, and Chemo until I was transferred to Dixon CC in September of 2024. Treatment continued until in May of 2025 I was seen by a Dr. Koshi from UICH who informed me that they believed my Cancer was in remission. Follow up diagnostics would be regularly scheduled, and my health would be monitored.

VI. LEGAL CLAIMS

36. Beginning in 2017 when I arrived at Stateville CC I was seen by medical personnel who were responsible for my healthcare and well-being. I reported that I was having frequent urination, straining to urinate, and a feeling of incomplete bladder emptying. The medical staff included Dr. Hensley, Dr. Perez, Dr. Vydas, Dr. Aguinaga, Nurse Practitioners Orr, Williams, and Bruckner. I would be seen by all of these individuals and I would continually inform them of my bladder/urination issues. None of these individuals I spoke with began diagnostics to detect or rule out the possibility that I had bladder cancer.

37. It would not be until I was being seen at UICH for an unrelated surgical procedure that the UICH Dr. would request a PSA Screening inorder to rule out prostate cancer. It would turn out to be a life-saving determination.

38. More specifically, on 12/6/2023, after having had the PSA Screening, I was seen by NP Orr. At this meeting I specifically asked what was the result of my PSA Screen. I also asked about the possibility of prostate cancer due to the symptoms I was experiencing. NP Orr pointedly refused to provide me with any information concerning the PSA Screen, refused to answer

7

any questions about prostate cancer, and hurried me out of the examine. I was not informed by Orr of any upcoming further testing that I would learn later had been ordered by Dr. Moreira, specifically a prostate biopsy. I would also later learn that the biopsy had been delayed by Stateville CC Healthcare Unit Administrator B. Chua, however, I have not been given an exact reason why Chua postponed this much needed test.

39. I began to suffer phsychological trauma from not being informed, acknow-ledged of, or treated for waht would be diagnosed as Stage 3 Aggresive pro-state cancer. I would be further traumatized after meeting with UICH oncl-logy staff and being informed of the cancer diagnosis, and then returning to Stateville CC where I would meet with Dr. Vydas who stated that there was no information contained in my medical records which indicated that I had been diagnosed with prostate cancer, and there were no orders for me-dicine or treatment. Dr. Vydas in fact showed that he was indifferent to the information I was providing to him, and left me without any further in-dication that he intended to follow up with UICH staff.

40. In February I would write a grievance concerning the lack of medical atten-tion I was receiving for the ongoing prostqte issue. This grievance would be denied by the counselor, then the grievance officer, and then by the Warden/ Chief Administrative Officer Charles Truitt. I would further per-sonally speak with Mr. Truitt several times, when I could catch him, and ask about what was being done to have the medical staff at Stateville CC care for me. I received no assistance or correspondence in return from him.

41. On February 27, 2024, I went to see Dr. Perez. I was further stunned that she didn't know anything about my prostate screen, the results, or any order or notes form UICH. Dr.Perez had my medical file in front of her and began a lengthy search of the file, and finding no information what so ever on anything concerning my prostate. However, I showed my medical records from UICH which showed she had acknowledged receipt of said documents on January 30, 2024, and February 6, 2024. None of the documents in my medi-cal file at Stateville, which she searched could be found in the file. No orders from any Stateville medical persons was in the file at that time.

8

42. I became alarmed and panicked at the knowledge that there was nothing in my file concerning my whole prostate cancer issue. Dr. Perez stated with indignation and frustration that "there is in fact delay." She would further state that she didn't know of the scheduling of UICH but, there was funding and payments which had to be worked out with Wexford (Wexford Health Sources Inc.) before I would be getting any treatment. Additionally, she stated I would not be getting scheduled by Stateville doctors until payment and logistics would be worked out, and nothing has been finalized.

43. On March 1, 2023, I had an opportunity to speak with Assistant Warden Benson. During that conversaiton I related all of the issues I had been experiencing including diagnosis, lack of treatment, scheduling of appointments etc. I expressly related the months / years I have been suffering since having arrived at Stateville CC with the pain and mental anguish. Mr. Benson pulled out a notebook and wrote down my name and ID#. He then told me that he would look into what the issue was with medical and would get back to me wihtin a week. I have never received any information or correspondence back from Mr. Benson. I begged and pleaded with him to get me help and he stated he would "get on this immediately". He did not.

44. On March 4, 2024, I was called to see NP Orr. Not about my concerns, as raised to Mr. Benson, but as to a writ return. I at length detailed all of the issues I had been suffering with since arriving at Stateville, the results of the PSA Screening, the information I had learned about treatment from consulting with oncology at UICH, and the lack of any type of info or treatment being received. NP Orr at first related some of the information I had already been provided, but then became very defensive and and said that UICH would be handling things now on. I was then told to leave.

45. On March 19, 2204 I was again sent out to UICH. At the time I was told I had 2 appointments. One was for A CT Scan, the other was not named, but I was told that it had been canceled. Stateville staff, transport officers and medical, refused to tell me what the appointment ahd been for or why it was canceled. Upon returning to Stateville CC I had to speak with the "writ" return nurse, Ms. Oswald and another unknown named African-American nurse.

I discussed and explained to them that I was feeling extremely traumatized over learning from the UICH Intern computer check that my cancer meds had been ordered, that I was supposed to begin treatments and that Stateville medical had been alerted and acknowledged receipt of these orders from them. At this time Ms. Oswald checked my file and located a document which indicated that I was supposed to be receiving medication ordered by UICH, but she could find no reason why I wasn't receiving it. Ms. Oswald informed me that there was nothing she could do except document what she and I had found. I filed a second grievance concerning this issue and it was denied by Stateville HUC staff and the grievance officer. It was then denied by the Chief Admin. Officer, Warden Truitt.

46. On March 20,2024, I was traumatized over the gross indifference to my health issues and treatment, that I requested to be seen by crises mental health. I was sent to see the psychiatrist, name unknown female, to whom I at length explained that I was despondent, couldn't eat right, couldn't get a restful sleep for months, and was at a point of great despair. All of the issues I ahd been suffering with I explained to her. I could see that my account caused her to be visibly shaken and she stated that she would be documenting everything I told her and reporting to medical.

47. On March 26, 2024, I was called to see Dr. Perez. At this meeting Dr. Perez stated that she couldn't find anything in my file from the last two visits to healthcare. That I was missing important paperwork in my file regarding what I was supposed to be receiving treatment for, and "where" I was supposed to be in my treatment program. Dr. Perez became visibly upset and began tossing my file around looking for anything concerning my cancer meds or plans. She then called in a male Nurse, Eddie, who she began to interrogate about the missing documents. More medical staff were then called in and  questioned about the missing documents. Nurse Eddie and the others then began to produce medical documents that Dr. perez stated she had never seen or had been made aware of. Dr. Perez further pressed Nurse Eddie and the others to locate the orders for medications that had come from UICH. After leaving and then returning Dr. Perez stated "these were ordered weeks ago!" "Where have they been?" Nurse Eddie responded that they had only been orderd 3 days ago on March 22, 2024. Dr. Perez was then told that Wexford's

10

Pharmaceutical provider, Boswell, which is owned by Wexford Health Sources, was "out of meds". This "fact" not having been shared with Dr. Perez or UICH medical staff. Personally I did not believe the story about Boswell. Dr. Perez then told me that my radiation therapy could not begin until I began the Chemo which ahd to be done at the same time. I broke down and lamented to the Dr. Perez and the other individuals around her that I feel that I am going to die before I get any treatment. All seemd to express sympathy for me. Dr. Perez stated that I should begin radiation therapy on April 12, 2024. I did not start until April 18.

48. On March 30, 2024, at 4:52am I was suddenly approached in my cell by medical who demanded I take my chemo medication. Later that same day, I was called to see Psychologist Dr. Sturgill. I related the issues and problems resulting from the ongoing delay in my treatment for prostate cancer and she stted that she would be documenting the entirety of what I was telling her. She also shared with me the fact that I was not alone in the delay tactics being used by Wexford and Stateville medical in the treatment of those in custody for cancer.

49. On April 4, 2024, I was seen by another psychologist, Dr. Stenton to whom I related the same events that I had been suffering with for these many months.

50. The next day, April 5, 2024, I was seen by NP Bruckner who denied any knowledge of what was going on with my treatment plans. Even though I had been seen by her a few weeks earlier and had been seen by her on February 21, she claimed to have no knowledge. The only thing she stated was that I had received a biopsy of my prostate on January 11, 2024, but did not have the results back. All she added was that she apologized for all of the pain and suffering I was going through.

51. On April 7, 2024, I was ordered to go to the Stateville CC Infirmary. Upon arrival I was informed by the nurse, name unknown, that I was scheduled to go out for a prostate biopsy. I informed her that there was some type of mistake as I had already had a biopsy and diagnosed with Stage 3 Cancer. I furhter showed her that I had been Tatoo/marked for the radiation treatments. Nurse Jane Doe observed the markings, however, she stated that she

had her orders, and I had to begin taking oral medication for the test. I
protested and she stated that I had to take the meds or they would take me
to Seg. (Segration holding) I knew that taking these medications had caused
me to be sick before and did not want to take them. But I also feared that
if I refused them they would use that against me to further delay or halt
my treatment, so, I took them; and was ill all night.

53. On April 8, 2024, I was awakened by the same nurse Jane Doe and informed
    that there had been a mistake, I wasn't going out for a biopsy, I was going
    for an MRI. I was transported to UICH for the MRI, however, after waiting
    for many hours in the UICH holding area, the writ officers came and told
    me the test was going to be rescheduled. They refused to tell me why and I
    was instead brought into a consult with the oncology team, where I informed
    them of my ongoing dilema and a formal complaint was filed. (See ID@ 33) I
    was then transported back to Stateville CC.

54. The grievance officers at Stateville CC were all made aware of the ongoing
    depravation and deliberate indifference to my serious medical needs,and
    were made aware of the worsening threat of my possibly dying due to the
    lack of treatment for my aggressive prostate cancer. Yet, they all denied
    the grievances submitted to them. Allem, McBee and Rivera all had an op-
    portunity to perform their duty and intervene in the ongoing issue, and
    chose instead to ignore me.

55. IDOC Director Latoya Hughes, and Admin. Review Board member Mr. Bonnett had
    a final opportunity to intervene and demand that I be provided with the ne-
    cessary and life saving medical treatment I was being denied of, however,
    by denying my grievances they chose to ignore my cries for help and decen-
    cy by denying those grievances,

57. On information and belief, Wexford Health Sources Inc., through policy and/
    or procedures, whether written or not, knowingly and purposely delayed or
    caused to be delayed both the diagnosis and treatment of my prostate can-
    cer by directing or incentivising the medical personnel under it's control
    to ignore or delay or differ, diagnostic testing and treatment in order to
    save money and increase profits at the cost of my health and welfare.

58. Upon information and belief, The Illinois Department of Corrections has contracted, and paid in advance, millions of dollars to Wexford Health Sources Inc. for the provision of medical treatment to all of the individuals held in custody by the IDOC, even though they know Wexford to have been in non-compliance with the terms of that contract; to be in violation of a consent decree entered into by the IDOC and Northern District of Illinois. The Illinois Department of Corrections has been found to be in Contempt of Court by District Judge Alonso for the continuing abuse of Individuals civil rights in their custody like me. Wexford Health Sources pays a fine every month that they continue to be in violation of that consent decree which includes the fact that they have not electronically digitized IIC's medical files; have not computerized their record, treatment, or progress of IIC's medical issues. (Lippert v. Illinois Dept. of Corrections) This has exacerbated the inordinate delay in providing me with the necessary care, treatment, and medications I need, and have needed, to prolong my life and alleviate the pain and suffering, both mental and physical, while I fight this disease.

59. The deliberate indifference and inordinate delay in diagnosing and treating my medical needs violated the protections afforded to prisoners, like myself, as required by the 8th Amendment of the U.S. Constitution against cruel and unusual punishment by the named defendants.

60. I, the Plaintiff, have no plain, adequate, or complete remedy at law to redress the wrongs described herein. I have been and could be irreparably further injured by the conduct of the defendants unless this court grants the declaratory and injunctive relief which Plaintiff seeks.

## VII. PRAYER FOR RELIEF

61. WHEREFORE, Plaintiff respectjully prays that this court enter judgement granting Plaintiff:

62. A declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and Laws of the United States.

63. A preliminary and permanent injunction ordering the defendants to provide

Plaintiff with all necessary medical diagnostics and treatment for his on-going medical health and well being.

64. Compensatory damages in the amount of $100,000.00 against each defendant, jointly and severally.

65. Punitive damages in the amount of $100,000.00 against each defendant.

66. A jury trial on all issues triable to jury.

67. Plaintiff's costs in this suit.

68. Any additional relief this court deems just, proper, and equitable.

Dated: 6-3-25

Respectfully submitted,

/s/

Willie Spates, R50820
Dixon Correctional Center
2600 N. Brinton Ave.
Dixon, IL 61021-9524
815-288-5561

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except to matters alleged on information and belief, and, to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Dixon, Illinois on 6-3- , 2025

/s/ Willie Spates

Willie Spates, ProSe